# ROBERT J. HILL et al. v. LUCRETIA A. BOYD et al., Appellants.

### Division One, November 21, 1906.

1. **WILL: Incapacity: Conflict in Substantial Evidence.** Where there is substantial evidence, on the one hand, that testatrix was of sound and disposing mind and memory at the time the will was drawn and executed, and, on the other, that she was at the time insane and remained so till her death, the appellate court will not disturb the verdict of the jury finding her incapacitated to make a will, if the question was submitted to them upon proper instructions.

2. ———: ———: **Facts in Evidence.** Two of the witnesses to the will testified that testatrix was not capable of making a will, and based their opinion on the facts that she was very old, was seriously sick with lagrippe, had previously been insane and did not recover from her sickness and became entirely insane before she died, did not recognize them, turned her head to the wall while it was being written, talked randomly and irrationally, did not seem interested in its preparation or execution, was held up to sign it, and only about half wrote her name

and said she could not finish it and it had to be finished by the scrivener, and while it was being written said nothing more intelligent than, "I suppose they will do what is right about it, they say they will." A son testified that she was on that night insane, the night before and that following was unconscious, did not know him, tore and pulled at the bed clothes and at times had to be held in bed. Other witnesses testified that a few days previously she was so much out of her head that she grabbed and tore off a watch chain from one of them, did not recognize her children and old acquaintances, and acted as an insane person. On the other hand, witnesses for proponents testified that on the day the will was executed she was rational, gave full directions to the scrivener for writing the will, recalled all her relatives and property, and sent for a certain lease in order to get a description of the land. *Held,* that this was substantial evidence both of her capacity and incapacity to make a will, and the instructions being correct a verdict of the jury setting aside the will will not be disturbed.

3. ———: ———: Instructions Approved. Instructions in this case, in all respects the same as those approved in Goodfellow v. Shannon, 197 Mo. 271, are approved on the authority of that case.

Appeal from St. Francois Circuit Court.—*Hon. Robt. A. Anthony,* Judge.

AFFIRMED.

*Benj. H. Marbury* and *John H. Malugen* for appellants.

(1) The court erred in giving respondents' instruction 3, for the reason that it is misleading in that it attempts to blend, with equal force, the effect of an emaciated body and a deranged mind. Old age and physical infirmities, or illness, do not constitute testamentary incapacity. Von de Veld v. Judy, 143 Mo. 348; McFadin v. Catron, 138 Mo. 197; Crowson v. Crowson, 172 Mo. 691; Jackson v. Hardin, 83 Mo. 175; McFadin v. Catron, 120 Mo. 252; Hughes v. Rader, 183 Mo. 630. (2) The court erred in giving respondents' instruction 5, for the reason that after appellants showed the formal execution of the will as required by the

statutes, and two of the subscribing witnesses had tes-
tified to testatrix's sanity, and that she was of proper
age to make a will, a prima-facie case was made; and it
then devolved upon the respondents to overcome this
prima-facie case by substantial evidence; whereas, by
this instruction, the court placed upon appellants the
burden of showing testamentary capacity by the pre-
ponderance of testimony, in addition to establishing
their prima-facie case. Carl v. Gabel, 120 Mo. 283; Mc-
Fadin v. Catron, 138 Mo. 197; Von de Veld v. Judy,
143 Mo. 348; Fulbright v. Perry County, 145 Mo. 432;
Sehr v. Lindemann, 153 Mo. 276; Jackson v. Hardin,
83 Mo. 175; Hamon v. Hamon, 180 Mo. 685; Hughes v.
Rader, 183 Mo. 630. (3) Mere opinions of witnesses,
unaccompanied by any testimony showing any particu-
lar act or fact evidencing incapacity, do not make out
a case of incompetency when the testimony shows that
the testatrix knew what she was doing and to whom she
was giving her property; Southworth v. Southworth,
173 Mo. 59; Sehr v. Lindemann, 153 Mo. 276; Crowson
v. Crowson, 172 Mo. 691; Hughes v. Rader, 183 Mo.
630. (4) However unjust a testatrix may be to any
one or more of her children, if she is competent to make
a will, she has a right to dispose of her property as she
pleases; and it is unsafe for courts and juries to look
to the will's equities, less they fall into greater mis-
chief of making wills for other people. Catholic Uni-
versity v. O'Brien, 181 Mo. 68; Jackson v. Hardin, 83
Mo. 175; Hughes v. Rader, 183 Mo. 630. (5) The law
does not require any particular degree of understand-
ing or capacity to justify the making of a will. The
test of capacity to make a will is that the testatrix be
capable of comprehending all of her property and all
persons who reasonably come within the range of her
bounty, and have sufficient intelligence to comprehend
her ordinary business, and to know what disposition
she is making of her property. It must, therefore, fol-
low, that there was no substantial evidence that the

testatrix did not possess mental capacity, as above defined, and that the court fatally erred in not so declaring as a matter of law, and instructing the jury to find for the appellants.    Hughes v. Rader, 183 Mo. 630; Hamon v. Hamon, 180 Mo. 685; Catholic University v. O'Brien, 181 Mo. 68; Sehr v. Lindemann, 153 Mo. 276; Riggin v. Westminster College, 160 Mo. 570; Woods v. Carpenter, 166 Mo. 465; Crowson v. Crowson, 172 Mo. 691; Southworth v. Southworth, 173 Mo. 59; Jackson v. Hardin, 83 Mo. 175.

*William S. Anthony* and *William H. Young* for respondents.

(1)  A suit to contest a will is an action at law, and when there is substantial, although conflicting evidence upon a proposition, it should be submitted to the jury and its finding will not be disturbed by the Supreme Court.    Goodfellow v. Shannon, 197 Mo. 271; Sayre v. Trustees Princeton University, 90 S. W. 794; Young v. Ridenbaugh, 67 Mo. 574; Schaaf v. Peters, 90 S. W. 1040; Fulbright v. Perry County, 145 Mo. 443.    (2)  Instruction 5 is proper, and is an exact copy of an instruction approved by this court in the case of Goodfellow v. Shannon, 197 Mo. 271.    It simply places the onus upon defendants (the proponents of the will) to show proper execution and attestation, and that the testatrix was of sound mind.    This burden has always been upon defendants in will contests.    Goodfellow v. Shannon, 197 Mo. 271; Carl v. Gabel, 120 Mo. 295; Norton v. Paxton, 110 Mo. 467; Craig v. Craig, 156 Mo. 362; Maddox v. Maddox, 114 Mo. 46.    (3)  Respondents' instruction 3 was approved in Goodfellow v. Shannon, supra.    We do not think this instruction is error. One of the first requisites of a sound and disposing mind is that it should be able to comprehend the business in hand.    The books and cases add other tests, but this is one of the tests, and if the mind for any reason fails to pass this test, it is not a sound and disposing mind.

If the mind was not in condition to understand the business in hand, when undertaking to formulate a will, it would be useless to ask for other or further tests, as, for instance, the ability to comprehend the general nature and extent of the property and to whom it was being given, and the several other tests prescribed by the books. That the test required by this instruction is the first test mentioned in the adjudicated cases and text-books hardly requires citation of authority. Goodfellow v. Shannon, supra; Schouler on Wills, sec. 68; Couch v. Gentry, 113 Mo. 266; Lorts v. Wash, 175 Mo. 502. (4) An examination of the record of the testimony of the witnesses for plaintiffs will disclose the fact that the contention of defendants, that the testimony of said witnesses was simply an expression of their opinion as to the capacity of testatrix to make a will, is not well founded. The record fails to disclose anything in violation of what was said by the court in Hamon v. Hamon, 180 Mo. 685; Crowson v. Crowson, 172 Mo. 691; Hughes v. Rader, 183 Mo. 530; Goodfellow v. Shannon, supra.

GRAVES, J.—This suit, brought in the circuit court of St. Francois county, is one contesting the will of Lucretia A. Hill, deceased. Plaintiffs and defendants are her heirs at law. Grounds of contest, mental incapacity and undue influence upon the part of defendants. Upon trial the court sustained a demurrer to the testimony as to the question of undue influence, but submitted the matter to the jury upon the question of testamentary capacity of the testatrix and the jury returned a verdict, signed by eleven jurors, in favor of contestants. After unsuccessful motion for new trial, the cause was appealed to this court by defendants.

There were three witnesses to the will, John H. Malugen, the scrivener, Jno. W. Shaner and Berry Snyder. Upon the part of the contestants the evidence shows that the testatrix was an old lady, 82 years of

age; that the alleged will was executed January 21, 1899; that on Thanksgiving day, 1898, testatrix was taken with a severe attack of la grippe, which affected her mind; that from this date she grew gradually weaker, physically and mentally, until October, 1899, when she died, at the time a raving maniac. Snyder and Shaner, two of the attesting witnesses, testify to their presence during the time the will was being written by Mr. Malugen; they observed and described her atcs during the time and testified that in their judgment they did not consider her competent mentally to make a will. Among other things Snyder said:

"Q. I will ask you if you didn't state there at Graff Buchanan's house in the presence of these parties, shortly after her death (Mrs. Lucretia Hill, testatrix) that at the time she (testatrix) made this will she was insane and didn't know what she was doing? A. No, I did not make that remark. I don't think I did. I will tell you the remark I did make. I said I didn't think she was capable of making a will.

"Q. What do you say about that now? A. I am just like I was that day.

"Q. You don't think she was capable of making a will? No, sir, I do not.

"Q. Then, Mr. Snyder, what do you mean by saying that she was not capable of making a will? A. Any person as old as she was and been sick as long as she had, and out of her head, crazy, before, I don't think she was capable of making a will. The first time I was ever in the house was the day the will was wrote.

"Q. How long had you known her (testatrix) prior to that time? A. Fifteen or twenty years.

"Q. During that time how near had you lived to where she lived? A. Five or six miles.

"Q. I understand you to say that she (testatrix) was not capable of making a will? A. I said I did not think she was. Any old person as old as that, and

been insane before and afterwards, I don't think is capable of making a will.''

Shaner says, among other things:

"Q. Then you lived within 250 yards of the residence of testatrix? A. Yes, sir.

"Q. Did you or not know Lucretia A. Hill during her lifetime? A. Yes, sir, I had known her quite a while.

"Q. What was her age at that time, if you know? A. Well, I don't know her exact age. She was very old.

"Q. What was her mental and physical condition? A. Well, she was physically very weak and childlike.

"Q. Where did you find Mrs. Hill? What was she doing? How was she lying in bed? A. Lying on her back in the bed.

"Q. What was she saying and doing? A. Well, I don't know that she was saying anything until we went in and spoke.

"Q. Did she know you, Mr. Shaner? A. I don't think she did.

"Q. You had known her for years before that? A. Yes, ten or twelve years.

"Q. Did she or not recognize you at any time you were in the room? A. Well, I don't know. I can't say that she did. I suppose that she did when we spoke to her. I spoke to her the first one and told her who I was, and she wanted to know why Mrs. Shaner didn't come.

"Q. Tell the court and jury how she acted and what she did. Explain her condition as near as you can. A. Well, Mr. Malugen was there to write the will, at least he wrote one. I can't say who was the first one spoke about writing the will. She would not recognize any one till they shook her.

"Q. State all she did and said. A. Well, I can't say whether it was Mr. Malugen, but I think he said something about writing a will.

Hill v. Boyd.

"Q. Well, in your opinion, Mr. Shaner, from what you saw and heard her say, did she know what she was doing. A. Well, at times she seemed to know what she was doing. While Mr. Malugen was writing the will unless somebody was speaking to her she would throw her head to the other side and mumble and talk to herself?

"Q. How long would she mumble? A. Most of the time unless somebody said something to her.

"Q. Did she seem to know what she was doing at the time she was doing this? A. I don't think she did. Mr. Snyder and I raised her up in bed and Mr. Malugen held the book while she tried to write her name. She wrote about half of it I think and Mr. Malugen helped her finish it.

"Q. Mr. Malugen held her hand and wrote the balance of her name? A. Yes, sir.

"Q. Then she did not sign her own name to that will? A. She attempted to and could not finish it. She stopped and said, 'I can't write it.'

"Q. What was her condition at the time she would be mumbling and talking to herself? Where were her eyes? A. I could not see her eyes, she always turned her eyes from us.

"Q. Did you hear Mr. Snyder talk to her during that time? A. I heard him when he went in and spoke to her. She didn't recognize him. She said she did not know who he was.

"Q. Well, did you tell her who he was? A. I think it was Mr. Boyd told her, as well as I remember.

"Q. Don't you believe she knew she was making a will? A. I believe she could have been made sign most any kind of old paper as far as that was concerned.

"Q. Don't you believe she knew she was making a will? A. I don't hardly think she did.

"Q. Well, why don't you think hardly? A. Some

parts of the time she seemed to be rational and part of the time she did not.

"Q.    Well, while she talked to you, you said she was rational.   A.   Yes, sir.

"Q.   Well, while I was drafting the will?   A.   She had her head turned.

"Q.   Was she asleep?   A. No, sir, I don't think so. As I said awhile ago, she had her eyes closed.

"Q.   How do you know she was not asleep?   A. I don't think she had time to go to sleep.

"Q.   During the time she was talking to herself what was she saying, if you know?   A.   One thing in particular, she made some remark, 'I suppose they will do what is right about it, they say they will.' What she meant I don't know.

"Q.   Then how is it you understood this?   A.   I could not understand all the time, I said part of the time.   She said it the same way several times, 'I guess they will do what is right about it, they say they will.'

"Q.   You thought at that time she was in what condition, when she was mumbling to herself?   A. She was just in a condition she talked to herself, that is all I can say."

*Robert J. Hill*  testified:

" Q. Who had been with your mother all that morning before Mr. Boyd went to Bonne Terre?   A.   Mr. and Mrs. Boyd were there with my mother.   Mr. Boyd made the remark that 'he thought mother was going to die the night before.'   I sat up with her until about 9 o'clock.   She was out of her head, seemed to be very feeble and had no mind.   She had to be held in bed. She was tearing the bed-clothes and pulling at the bed and tearing the bed-clothing off. Sometimes it took two or three to hold her in bed.

"Q.   How long was that before the making of the will?   A.   Several days.   From the time she first took

sick, that was on Thanksgiving day, from then she grew worse.

"Q. State how she acted on the day of making the will. A. I passed through the room once that day and she seemed to be sleeping. That night she seemed to be out of her head and the night before.

"Q. What did she say the day of the night before the making of the will and the night of the making of the will? A. She talked at random when any of them came around. I kept at a perpetual distance. I tried to keep away from her, and once I wanted to take her some water and Mr. Boyd says, 'No, the doctor told me to wait on her.' I took her the water and she threw the water out. Seemed to me she tried to throw the water on me.

"Q. From what you saw of your mother, what would you say about her mental condition on the day before the making of the will, the day of the making of the will, and the night of the making of the will? A. She was in a very critical condition.

"Q. What was her mental condition? A. She was insane.

"Q. How long did she remain in this condition after the making of the will? A. Until October 21st.

"Q. She remained in that condition? A. Yes, sir, her mind gradually grew worse, until she lost her mind entirely.

"Q. Did she or not recognize you at any time the night of the making of the will, the day before and the night before the making of the will? A. No, sir, she did not. That night she was raving.

"Q. What night? A. On Sunday night.

"Q. Who was present? A. Mr. Boyd and family all in there.

"Q. You say she did not know you? What opportunities did you give her to recognize you? A. I went up to her and spoke to her and she did not say anything.

"Q. How do you know she did not recognize you? A. She seemed too flighty, out of her mind. She talked at random.

"Q. Did she look at you? A. Yes, sir. She would grab hold of you by the hair or any place she could get hold of you. This was the night before the will was made."

This testimony bears directly upon her condition the day of the execution of the will. In addition there was other testimony showing her mental condition a few days prior, in which it appears that she was so much out of her head that she grabbed and tore off a watch chain from one of the witnesses; that she did not recognize her children and her old acquaintances; that she acted as an insane person; these things occurred within a week or ten days of the execution of the will.

On the other hand, the testimony of witnesses for the defendants was to the effect that on the day of the execution of the will she was rational; that she gave full and complete directions to the scrivener for writing the will; that she recalled all her relatives and her property, and sent for a certain lease to get the description of the land. Defendants do not deny that her mental condition the night before the making of the will was bad, but show it good at the time of executing the will, by the scrivener and others. From what has been set out without going further into the evidence, it will appear that there was a sharp conflict in the testimony as to the mental condition of the testatrix at the time of executing the alleged will. In other words, the record shows substantial evidence upon both sides of the question.

I. It is well-settled law that where there is substantial evidence as to mental incapacity of the maker of a will, and the question is submitted to the jury upon proper instructions, this court will not disturb the verdict. [Goodfellow v. Shannon, 197 Mo. 271; Sayre v. Trustees of Princeton Univ., 192 Mo. l. c. 120; Young

v. Ridenbaugh, 67 Mo. 574; Schaff v. Peters, 111 Mo. App. l. c. 459; Fulbright v. Perry County, 145 Mo. l. c. 443.]

There was substantial evidence upon which to submit that question to the jury in this case, and the judgment should be affirmed, unless there was error otherwise in the course of the trial.

II. Complaint is made of instructions numbered 3 and 5, given in behalf of the contestants. These instructions have been held proper by this court in the recent case of Goodfellow v. Shannon, 197 Mo. 271. Instruction numbered 3 in this case is the same as number 13 in the Goodfellow case, and number 5 in this case is identical with number 11 in the Goodfellow case. We considered and discussed these instructions fully in that case, and upon the views therein expressed, we overrule the contention of appellants here.

This disposes of the chief questions raised by appellants. In our judgment there was ample evidence to submit the case to the jury upon the question of mental incapacity, and the same was submitted by proper instructions, and the verdict and judgment should not be disturbed.

We therefore affirm the judgment.

All concur.